**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| v.  § | **CR. NO. C-06-563** |
| § | |
| **CITGO PETROLEUM CORPORATION** § | |
| **CITGO REFINING AND CHEMICALS** § | |
| **COMPANY, L.P.** § | |
| **PHILIP D. VRAZEL** § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is CITGO's Motion To Strike The Specific Causation Testimony of Dr. Weis (Dkt. No. 671). The Government has not filed a response to CITGO's motion. Having considered the motion, supplement, record, and the relevant law, the Court is of the opinion that the motion should be **GRANTED**.

**Background**

On May 2, 2008, the Government offered the testimony of Christopher P. Weis ("Dr. Weis"). Dr. Weis was offered as an expert witness in the field of toxicology.

Dr. Weis testified that he has a bachelor's degree in biology, a master's degree in medical physiology, and a doctorate in medical physiology and toxicology. After graduation, Dr. Weis worked as an instructor at the medical school at Michigan State University for approximately two years. He then worked at the medical school at the University of Virginia for another two years conducting research. Dr. Weis then joined the Environmental Protection Agency's (EPA) regional office in Denver in July of 1989 and worked there until 2002. Since 2002, Dr. Weis has worked for the National Enforcement Investigation Center (NEIC), a forensic center for the EPA. Dr. Weis is board certified and a member of the Society of Toxicology and the American Association for the

Advancement of Science.

On direct examination, Dr. Weis testified that he had an opportunity to review a variety of information for this case. He stated that he reviewed the "witness complaints," "some data from the various monitors that have been discussed," certain illustrations, and an analysis of the chemicals in CITGO's tanks 116 and 117. Dr. Weis further stated that he had sat in and listened to all of the hearing testimony. Dr. Weis noted the consistency of the witness complaints, namely descriptions of symptoms such as "dizziness, ringing in the ears, the nauseous feelings, particularly burning in the throat."

Dr. Weis next testified that tanks 116 and 117 contained chemicals in addition to benzene. He indicated that many of these chemicals have neurological effects similar to benzene. Dr. Weis agreed that the contents of tanks 116 and 117 are properly described as a "chemical cocktail." According to Dr. Weis, if benzene was not considered, the remaining chemicals in tanks 116 and 117 had the potential to cause the symptoms about which the alleged victims complained.

Dr. Weis stated that complaints pertaining to "weight on the chest or burning in the chest, burning in the throat and mouth [are] very, very consistent with exposure to the high concentrations of acid gas that have been measured in the area." He further explained that people exposed to high levels of acid gas could experience a choking event in the evening. Dr. Weis explained that acid gas is any gas that would produce acid when it becomes hydrated, such as hydrogen sulfide or sulfur dioxide.

When asked if an analysis of the chemicals in tanks 116 and 117 "should be done not just by looking at it chemical by chemical, but considering the toxic effects of the chemicals all in combination," Dr. Weis agreed. He explained that many of the complaints, such as dizziness and nausea, are consistent with exposure to most or all of the hydrocarbons at issue when at a high

enough concentration. Dr. Weis further testified that the physical symptoms and complaints in this case were consistent with symptoms and complaints previously documented in persons exposed to the chemicals present in oil.

At the conclusion of Dr. Weis' direct examination, he was asked the following question: "Based on your experience and training, and taking into consideration the material that you have reviewed, the evidence that you have heard, have you formed an opinion to a reasonable degree of toxicological certainty about whether or not tanks 116 and 117 are the direct cause of the health effects such as headaches, loss of breath, burning throat and lungs, watery eyes, skin irritation, fatigue suffered by the victim witnesses that have testified before this Court?" Dr. Weis responded by stating "Yes, I have." Dr. Weis then testified that it was clear that exposure to acid gas and mixed chemicals from tanks 116 and 117 caused the symptoms complained about by the alleged victims.

On cross examination, Dr. Weis was asked about his methodology. Dr. Weis testified that it is not unusual when arriving at a scientific opinion to look at symptomology, doctors' reports, effects, and the site at issue. Dr. Weis was asked if proper methodology of risk assessment involved the following steps in the order presented: (1) identifying the source of offensive materials; (2) identifying whether there was exposure to the offensive material; (3) identifying the nature or volume of the dose of the exposure; and (4) determining if any health effects would result. Dr. Weis responded by stating that the components of the question were correct, but that the order in which information is acquired is not always linear. According to Dr. Weis, it is not uncommon to first find an effect and work backwards from it in a laboratory setting.

Dr. Weis testified that a rotten egg smell is characteristic of hydrogen sulfide and that a burning match smell is characteristic of sulfur dioxide. He stated that it was possible that acid gas

3

was emitted from various flares, both inside and outside of the CITGO refinery. Dr. Weis further testified that although it was unclear whether or not the data analyzing the contents of tanks 116 and 117 took sulfur dioxide or hydrogen sulfide into account, there was no evidence showing that those chemicals were in the tanks. Dr. Weis specifically testified that "the data is incomplete to allow me to determine whether or not there was sulfur in tanks 116 and 117."

Dr. Weis testified that he did not review any of the medical records of the alleged victims. He stated that although he is not a medical doctor, he has examined medical records in the past. Dr. Weis further testified that his opinion was not based on the review of any medical records, although several of the alleged victims did have medical records.

Dr. Weis testified that he did not dispute that the odor threshold for benzene was approximately 2,700 parts per billion. He conceded that the data measured at the Huisache monitor indicated benzene levels below the odor threshold.

Dr. Weis also testified that the Centers for Disease Control, "the federal health agency," has selected a short term or acute exposure level for benzene of nine parts per billion. He stated that the EPA does not have a corresponding short term value, but that a "risk reference concentration" of three parts per billion is used. Dr. Weis also agreed that the TCEQ effects screening level for benzene was at least 54 parts per billion. After being questioned about the summa canister data, Dr. Weis testified that those samples indicated that for a 30 minute duration tank 116 registered 4.5 parts per billion and tanks 117 registered 48 parts per billion.

Dr. Weis testified that he was aware of the practice of utilizing modeling to predict the concentrations of emissions. Dr. Weis asserted that in the circumstances of this case it would be improper to utilize modeling.

On July 1, 2008, Dr. Weis provided further testimony before the Court. In the interim, Dr.

Weis heard the testimony of CITGO's toxicologist, Janet Kester ("Dr. Kester"), and CITGO's medical expert, Jeff Britton ("Dr. Britton").

On direct examination Dr. Weis was asked why he, as a toxicologist, credits "the testimony of the victim witnesses over the scientific or modeling data." Dr. Weis responded by stating, in part, that "we've discussed a number of reasons, plumes, spikes, etcetera, but I think there are some common sense things that come to my mind as I, you know, think back over the testimony that we've heard and the data that we've looked at. They include some very common sense approaches, like the temporality of this. The people get exposed and they go to the doctor." Dr. Weis testified that there was a "strong association" that people had similar symptoms and that they went to doctors independently of each other.

Dr. Weis testified that the Court had heard about "dose response" at length. He stated that "[w]hen the concentrations are low, there are no complaints or very few complaints. When concentrations go up, we see health effects and we see people responding to those health effects by going to their doctors and they're reporting to their neighbors, etcetera, etcetera."

Dr. Weis was questioned about Government's Exhibit 66, which listed the following symptoms: (1) burning eyes; (2) bad taste in the mouth; (3) nose burning; (4) sore throat; (5) skin rashes; (6) shortness of breath; (7) vomiting; (8) dizziness; (9) nausea; (10) fatigue; and (11) headaches. Dr. Weis testified that these symptoms were consistent with the symptoms complained of by the alleged victims in their statements. When asked, "Do you agree that these are some of the symptoms that would be experienced by an individual in an occupational setting who had been exposed to a chemical release?" Dr. Weis replied by stating, "They may be. They may be." When asked if the testimony of the alleged victims was consistent with an understanding of occupational exposures and a London Fog example, Dr. Weis stated, "Yes. This is—I mean, it's very plausible.

5

What we see—I mean, that's the other common sense thing, is that this is very much what you would expect from the toxicology. It's very plausible that exposure to the chemicals that we know existed could cause these symptoms. So, from a common sense point here, it's very—it's plausible."

Dr. Weis was then asked "based on the additional materials that you have listened to and reviewed, does it remain your opinion that tanks 116 and 117 are the direct and []proximate cause of the health effects suffered by the victim witnesses that have been testified to before the Court?" Dr. Weis responded by stating, "Yes. I think that's the most likely—most likely conclusion." He further testified that his opinion is accurate to a reasonable degree of toxicological certainty.

On cross examination, Dr. Weis was asked if he had any data to support his assertion that there was a "dose response relationship," namely that high concentrations caused health effects and complaints while low concentrations did not result in health effects or complaints. Dr. Weis responded by stating that the victim impact statements documented reports of health effects as well as the testimony of the alleged victims. Next, Dr. Weis was asked, "Isn't it true that the evidence before this Court is that none of the doctors whose medical records were reviewed, none of those doctors concluded, from a medical standpoint, that the complaints had an etiology in exposure to chemicals." Dr. Weis responded by stating, "Partially, that's true, but I would take the parentheticals to indicate that the physicians had some concern about chemical exposure. We saw at least a couple of those." Dr. Weis then testified that there were a total of two parentheticals. One parenthetical recorded that a "complainant reported something" while the other parenthetical recorded the phrase "cannot rule out." When asked "[s]o in all of the medical records, there were only two things and they were parentheticals?" Dr. Weis responded by stating "Yes. I—Yes, that's correct, Mr. DeGuerin, but I think, to explain, I think it's very important for the Court to know that

6

those physicians, those family physicians, most of these folks were probably not occupational physicians, did not have access to the incident reports."

When Dr. Weis was asked to confirm that the basis of his statement regarding the dose response relationship did not involve monitoring data or doctors' reports, but only involved complaints made by the alleged victims, Dr. Weis stated that "[t]hat's one indication, yes." He followed up by asserting that other indications included certain common sense observations such as "the fact that when people are exposed to higher concentrations, they have different effects than if they're exposed to lower concentrations." Dr. Weis then testified that he was not aware of any peer reviewed articles or other data that indicated that Corpus Christi had higher rates than anywhere else of burning eyes, bad taste in the mouth, nose burning, sore throat, skin rashes, shortness of breath, vomiting, dizziness, nausea, fatigue, or headaches.

Dr. Weis next testified about data he reviewed as a basis for his finding of a dose response relationship. He indicated that he considered the complaints about odors, which coincided with health effects, that led TCEQ investigators to tanks 116 and 117. Dr. Weis, however, testified that he did not try to examine monitoring data on the dates on which complaints were made. He stated that it would be very difficult to do so because the monitoring data was collected over 24 hour periods every sixth day. Dr. Weis then testified that he was not aware that before 2003, the Huisache monitor was operated every day from November through April. He also testified that he was aware that after 2003 continuous monitoring took place at Huisache via gas chromatography.

Dr. Weis was asked "whether you found any monitored level of VOC's that were high enough to cause adverse health effects, in your review of the monitored data, which you say you didn't review all of it? Did you find any?" He responded by stating, "I didn't see any, but once again, that data, to explain, it is averaged. It's averaging these high concentrations. In many cases,

7

the data presents single chemicals when we know there are mixed chemicals, dozens of chemicals here. So, no, there's not any single piece of data that I reviewed that would cause adverse health effects, with the exception of sulfur dioxide." When asked if Dr. Weis was of the opinion that sulfur dioxide was being emitted from tanks 116 and 117, he responded by stating, "I haven't seen any data that would support that. There is no monitoring data, because I don't believe it was collected."

## Legal Standard

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). A district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592–93). The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

8

relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

"[A]n expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation." *Daubert*, 509 U.S. at 592. The Fifth Circuit has stated that when exercising discretion, "the district court may exclude expert testimony that lacks an adequate foundation." *Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 752 (5th Cir. 1994). "[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the [factfinder's] role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration." *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## Discussion

CITGO contends that Dr. Weis' specific causation testimony should be stricken for several reasons. CITGO initially argues that Dr. Weis' methodology is flawed. Specifically, CITGO argues that Dr. Weis concluded that the alleged victims' symptoms were caused by tanks 116 and 117 solely on the basis that their symptoms were consistent with chemical exposure. According to CITGO, this analysis of causation is unreliable because it does not take possible alternative causes into account. CITGO supports its position by arguing that when asked about his methodology, Dr. Weis unreliably asserts a correlation between higher concentrations and visits to doctors even though he concedes that he is not a medical doctor, has not reviewed any of the alleged victims'

medical records, and concedes that he is unaware of evidence showing a greater amount of common symptoms in Corpus Christi compared with the rest of the country. CITGO also stresses that Dr. Weis did not compare the monitored emissions levels with the dates of the alleged victims' symptoms.

CITGO further maintains that Dr. Weis' opinion is undermined by his failure to examine certain empirical evidence or to consider evidence that is contrary to his opinion. CITGO asserts that Dr. Weis ignored data from several air monitors in the Corpus Christi area and focused on the benzene readings from the Huisache monitor. Furthermore, CITGO claims that even though Dr. Weis claimed that health effects were caused by a "chemical cocktail," he did not examine the monitoring data for any volatile organic compounds other than benzene. CITGO also reminds the Court of Dr. Weis' admission that none of the monitoring data of volatile organic compounds showed concentrations capable of causing health effects. Accordingly, CITGO claims that Dr. Weis' analysis is incomplete.

Lastly, CITGO argues that Dr. Weis' opinion that acid gas contributed to the alleged victims' symptoms is unreliable. CITGO emphasizes that (1) Dr. Weis believes that acid gas causes symptoms at lower concentrations than various threshold levels selected by government agencies; (2) the monitoring data contradict Dr. Weis' conclusions; and (3) Dr. Weis concedes that there is no evidence that acid gas was emitted from tanks 116 and 117.

After examining the record and the relevant law, the Court finds that Dr. Weis' causation testimony should be stricken from the record. The Court is troubled by Dr. Weis' almost exclusive reliance on the testimony and victim impact statements of the alleged victims used to arrive at his opinion. The problem with this approach is that it does not adequately take into account possible alternative causes of the alleged victims' symptoms. This is particularly important in the case at bar

because the symptoms exhibited by the alleged victims are commonplace and are associated with many causes. If one theory of causation is not shown to be more likely than other theories of causation, it amounts to improper speculation and is not admissible. *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir. 1990); *cf. Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 797 (S.D. Tex. 2000).

Courts have required something more than simple symptoms and a possible cause when finding causation in cases involving chemical exposures. This is especially true when "working backwards" from symptoms to a cause. *See Castellow*, 97 F. Supp. 2d at 780. The extra evidence necessary to support a theory of causation may include accurate information about the level of exposure or unusually compelling circumstances. *Moore*, 151 F.3d at 278. This case lacks sufficient additional evidence supporting Dr. Weis' theory of causation. Dr. Weis has conceded that the monitoring data do not show levels of volatile organic compounds that would cause health effects. Dr. Weis has also conceded that he did not examine the relevant medical records. The medical records themselves do not show diagnoses of chemical exposure, but instead document a variety of illnesses that may be responsible for the symptoms described in this case. Although a few instances of odors and symptoms were traced to tanks 116 and 117 along with certain complaints about symptoms, the temporal connection between exposure and symptoms is generally not entitled to great weight. *Moore*, 151 F.3d at 278. No evidence showing harmful concentrations during these occurrences has been brought to the Court's attention. Also, no medical records reflect diagnoses of chemical exposure due to these specific events.

Dr. Weis' opinion that tanks 116 and 117 caused the alleged victim's symptoms because of acid gas is also not reliable. Dr. Weis did not identify any evidence showing that acid gas originated from tanks 116 and 117. To the contrary, he conceded that he was not aware of any such evidence.

Accordingly, it is improper for Dr. Weis to state that emissions from tanks 116 and 117 caused symptoms due to acid gas.

## Conclusion

For the foregoing reasons, CITGO's Motion To Strike The Specific Causation Testimony of Dr. Weis (Dkt. No. 671) is hereby **GRANTED**.

It is so **ORDERED**.

**SIGNED** on this 31st day of March, 2011.

*[signature: John D. Rainey]*

JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE