UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | CRIMINAL ACTION NO. C-06-563 |
| CITGO PETROLEUM CORPORATION, CITGO REFINING AND CHEMICALS COMPANY, L.P., | | |
| Defendants. | | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendants CITGO Petroleum Corporation and CITGO Refining and Chemicals Company, L.P.'s (collectively "CITGO") Motion to Vacate CITGO's Conviction for Violations of the Migratory Bird Treaty Act (Dkt. No. 766), to which the United States of America ("the Government") has responded (Dkt. No. 770) and CITGO has replied (Dkt. No. 771). Having considered the motion, response, reply, record, and relevant law, the Court is of the opinion that CITGO's motion should be **DENIED**.

**I. Background**

The Migratory Bird Treaty Act (MTBA) makes it unlawful for any person, "at any time, by any means or in any manner," to take or kill any migratory bird without a permit or as otherwise provided by regulations. 16 U.S.C. § 703(a). The MBTA creates three classes of crimes: (1) a strict liability Class B misdemeanor, *Id.* § 707(a); (2) a felony for a knowing sale, *Id.* § 707(b); and (3) a Class A misdemeanor for the placement of bait for the purpose of aiding in taking, *Id.* § 707(c).

On July 17, 2007, CITGO was convicted of Counts Eight, Nine, and Ten of the Superseding Indictment for unlawfully taking and aiding and abetting the taking of migratory birds. All three convictions were Class B misdemeanors under § 707(a). The Indictment alleged that between April and May of 2003, ten birds were found in two large open-top tanks identified as Tanks 116 and 117 at the CITGO East Refinery Plant, a petroleum refinery owned and operated by CITGO. According to the Indictment, because the birds were found in tanks owned by CITGO, CITGO had taken, or aided and abetted in the taking of, migratory birds in violation of the MTBA.

During the bench trial, the Government introduced testimony and other evidence that migratory birds and the remains of migratory birds were found in Tanks 116 and 117. (*See, e.g.*, 7/17/2007 Trial Tr. at 161:1-13.) According to the evidence presented at trial, these birds flew into the tanks and died as a result of landing in oil. (*See, e.g.*, *Id.* at 182:10-20.) The Court returned a verdict of guilty and entered conviction against CITGO on three counts of violating the MBTA. In a separate jury trial, CITGO was also convicted of failing to install emission control equipment (roofs) on the two tanks where the migratory birds were found, in violation of the Clean Air Act. 42 U.S.C. §§ 7413(c)(1) & 7411(e); 40 C.F.R. § 60.692-4.

CITGO now moves the Court to vacate its convictions under the MTBA on the grounds that the Government's Indictment fails to state an offense.

## II. Legal Standard

Federal Rule of Criminal Procedure 12 provides that, "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." FED. R. CRIM P. 12(b)(3)(B). *See also United States v.*

*Oberski*, 734 F.2d 1034, 1035 (5th Cir. 1984) ("[A]n objection that an indictment fails to state an offense can be raised any time during the pendency of the proceedings.").

### III. Analysis

CITGO argues that the MTBA criminalizes the unlawful taking or killing of migratory birds by hunting, trapping, poaching, or similar means, but it does not criminalize commercial activities in which migratory birds are unintentionally killed as a result of activity completely unrelated to hunting, trapping, or poaching. Because its conduct of operating Tanks 116 and 117 was not directed at the capture of wildlife, CITGO claims that the Indictment failed to state an offense, and the convictions must be vacated. In response, the Government argues that because the MTBA prohibits the taking or killing of a migratory bird "at any time, by any means or in any manner," 16 U.S.C. § 703(a), the MBTA extends beyond hunting, trapping, or poaching and reaches conduct by corporations that results in the taking and killing of migratory birds. As such, the Government contends that the Indictment in this case was sufficient, and CITGO's convictions should stand.

A number of courts have determined that the MTBA is limited in its intended scope to the types of activities engaged in by hunters and poachers and does not extend to other acts that indirectly or unintentionally cause the death of protected birds. *See Newton County Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997) ("[T]he ambiguous terms 'take' and 'kill' in 16 U.S.C. § 703 mean 'physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918.'") (quoting *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 303 (9th Cir. 1991)); *United States v. Brigham Oil & Gas L.P.*, 2012 WL 120055, *6 (D.N.D. Jan 17, 2012) ("Like timber harvesting, oil development and production activities are not the sort of physical conduct engaged in by

hunters and poachers, and such activities do not fall under the prohibitions of the [MBTA]."); *United States v. Chevron*, 2009 WL 3645170, *3 (W.D. La. Oct. 30, 2009) ("It is clear and that the provisions of the MTBA were designed to deal with persons who hunt or trap migratory game birds."); *Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996) ("Properly interpreted, the MBTA applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting or trapping, and trafficking in birds and bird parts. The MBTA does not apply to other activities that result in unintended deaths of migratory birds."); *Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F. Supp. 1502, 1510 (D. Or. 1991) ("I further find that the Act was intended to apply to individual hunters and poachers . . . .").

An almost equal number of courts, however, have explicitly rejected the argument that the MTBA is limited to activities such as hunting, trapping, and poaching, but instead reaches other conduct that results in the taking and killing of migratory birds. For example, in *Corbin Farm Service*, the court held that the MTBA applied to defendants that accidentally poisoned migratory ducks by applying pesticide to an alfalfa field, noting that § 703 made it illegal to kill migratory birds "by any means or in any manner." *United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 532 (E.D. Cal. 1978), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978). The court examined the MBTA's legislative history and concluded:

> The fact that Congress was primarily concerned with hunting does not, however, indicate that hunting was its sole concern. Paring the language of section 703 down to its essentials, the section makes it illegal 'at any time, by any means or in any manner, to . . . kill . . . any migratory bird . . . .' The use of the broad language 'by any means or in any manner' belies the contention that Congress intended to limit the imposition of criminal penalties to those who hunted or captured migratory birds. Moreover, a number of songbirds and other birds not commonly hunted are protected by the conventions and so by the Act; Congress imposed criminal penalties on those who killed these birds as well as on persons who hunted game birds. The legislative history of the Act reveals no intention to limit the Act so that it would not apply to poisoning.

4

*Id.*

Similarly, the court in *Moon Lake* held that the MTBA applied to the actions of a rural electrical distribution cooperative in failing to take protective measures to prevent migratory birds from being electrocuted by its power lines, also recognizing that § 703 made it illegal to kill migratory birds "at any time, by any means or in any manner." *United States v. Moon Lake Electric Ass'n, Inc.*, 45 F. Supp. 2d 1070, 1074 (D. Colo. 1999). The Court explained that "[i]In proscribing the acts of taking, capturing, killing, possessing, selling, purchasing, importing, exporting and transporting, Congress expressed a clear intent to proscribe conduct beyond that associated only with hunting, trapping or poaching." *Id. See also United States v. Van Fossan*, 899 F.2d 636, 637 (7th Cir. 1990) (upholding defendant's conviction for accidentally poisoning migratory birds while intending to poison non-migratory birds, stating that "[a]lthough neither [the common grackle nor the mourning dove] seems to need protection, each is 'migratory' and the regulations under the Migratory Bird Treaty Act do not allow people to poison them . . . ."); *United States v. FMC Corp.*, 572 F.2d 902, 908 (2d Cir. 1978) (upholding pesticide manufacturer's conviction under the MBTA for killing migratory birds as a result of dumping waste water into a retaining pond frequented by migratory birds and rejecting the argument that there must be an intent to harm birds in order to sustain a conviction); *United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010) (affirming oil producers' misdemeanor convictions under the MTBA after dead migratory birds were discovered lodged in pieces of their oil drilling equipment); *United States v. Rollins*, 706 F. Supp. 742, 745 (D. Idaho 1989) (noting that criminal liability could be imposed for the unintentional killing of migratory birds, but finding the MTBA did not apply to landowner who inadvertently killed a flock of geese by applying a registered pesticide to his fields in the prescribed manner); *North Slope Borough v. Andrus*, 486 F. Supp.

332, 361–62 (D.D.C. 1980), *aff'd in part, rev'd in part on other grounds*, 642 F.2d 589, (D.C. Cir. 1980) (in a civil action to enjoin an oil and gas offshore lease sale that would potentially violate the MBTA, the court stated that the MBTA prohibits the killing of birds by any means or in any manner, even if the killings were not intentional).

Although the Fifth Circuit has not addressed whether the MBTA is limited to conduct engaged in by hunters, it has explicitly held that "[v]iolations of § 703 are strict liability offenses, requiring no proof of specific intent to commit the crime." *United States v. Stephans*, 142 Fed. App'x 821, 822 (5th Cir. 2005) (defendant shot and killed an endangered bird species) (citing *United States v. Morgan*, 311 F.3d 611, 616 (5th Cir. 2002)). *See also United States v. Pitrone*, 115 F.3d 1, 6 (1st Cir. 1997); *United States v. Corrow*, 119 F.3d 796, 805 (10th Cir. 1997); *United States v. Boynton*, 63 F.3d 337, 343 (4th Cir. 1995); *United States v. Engler*, 806 F.2d 425, 432 (3d Cir. 1986); *United States v. Wulff*, 758 F.2d 1121, 1124 (6th Cir. 1985); *United States v. FMC Corp.*, 572 F.2d 902, 908 (2d Cir. 1978); *United States v. Ray*, 488 F.2d 15, 19 (10th Cir. 1973); *Rogers v. United States*, 367 F.2d 998, 1001 (8th Cir. 1966).

In *Morgan*, the Fifth Circuit upheld the conviction of a hunter who exceeded the daily bag limit of birds allowed under applicable hunting regulations, finding that misdemeanor offenses under the MBTA are strict liability offenses.[1] 311 F.3d at 616. In so doing, the court noted that Congress has consistently referred to misdemeanor offenses under the MBTA as strict liability offenses. *Id.* at 651. The court further recognized that the felony penalty provision of §

---

1. CITGO claims that "[a]lthough it is the view of some circuits that the MBTA a strict liability statute in its entirety, the Fifth Circuit does not join in that view." (Dkt. No. 771 at 3 n.1 (citing *United States v. Adams*, 174 F.3d 571, 576 (5th Cir. 1999)).) Prior to its decisions in *Stephans* and *Morgan*, the Fifth Circuit stated that it "'require[s] a minimum level of scienter as a necessary element of an offense of the MBTA'" with respect to baiting offenses. *Adams*, 174 F.3d at 576 (quoting *United States v. Sylvester*, 848 F.2d 520, 522 (5th Cir. 1988)). In *Morgan*, the Fifth Circuit distinguished *Adams* and *Sylvester*, explaining that "[b]aited field offenses present a unique risk that unsuspecting hunters will be held responsible for the unlawful conduct of others, namely, the actual baiting." *Morgan*, 311 F.3d at 614–15. This risk, however, is not present in the case of taking or possession offenses. *See Id.*

6

707(b) was amended in 1986 to provide that a defendant must act "knowingly;" however, the legislative history expressly stated that nothing in the amendment was intended to alter the strict liability standard for misdemeanor prosecutions under § 707(a). *Id.* (citing Senate Rep. No. 99-445, P.L. 99-645 at 16). Likewise, when Congress amended § 707(c) in 1998 to add a scienter requirement for baited field offenses, Senate Report 105-366 expressly provided that the elimination of strict liability applied only to hunting over baited areas and was not intended to affect the general application of strict liability under the MBTA. *Id.*

CITGO complains that to hold it strictly liable under the MTBA and extend the statute "to reach other activities that indirectly result in the deaths of covered birds would yield absurd results." (Dkt. No. 766 at 8 (quoting *Brigham Oil & Gas*, 2012 WL 120055, at *10).) According to CITGO, if the MTBA prohibited any conduct that caused the death of a migratory bird, then "many ordinary activities such as driving a vehicle, owning a building with windows, or owning a cat, [which] inevitably cause migratory bird deaths" would be criminalized. (*Id.*)

The Second Circuit rejected this argument in *FMC Corp.*, concluding that "[i]mposing strict liability on FMC in this case [by analogizing to tort cases] does not dictate that every death of a bird will result in imposing strict criminal liability on some party." *FMC Corp.*, 572 F.2d at 908. The court explained that the defendant's choice to engage in an activity involving the manufacture of a highly toxic chemical and failure to prevent the chemical from escaping into a pond and killing birds was sufficient to impose strict liability, reasoning:

> Certainly construction that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense. As stated in one of the early decisions under the Act, '(a)n innocent technical violation on the part of any defendant can be taken care of by the imposition of a small or nominal fine.' *United States v. Schultze*, 28 F. Supp. 234, 236 (W.D.KY. 1939). Such situations can be left to the sound discretion of prosecutors and the courts.

*Id.* at 905. Similarly, the court in *Moon Lake* acknowledged that even under a strict liability standard, the government still had to prove that the defendant's conduct constituted both the cause in fact and proximate cause of the protected bird's death. *Moon Lake*, 45 F. Supp. 2d at 1084.

Although the Fifth Circuit has not been faced with the question of whether oil companies can be held liable under the MTBA when migratory birds are killed as a result of their operations, other courts have addressed this issue, with varying results.

The defendants in the consolidated case of *Apollo Energies* were convicted of misdemeanor violations of the MTBA when dead migratory birds were discovered lodged in pieces of their oil drilling equipment. *United States v. Appollo Energies, Inc.*, 611 F.3d 679, 682 (10th Cir. 2010). In each case, migratory birds were attempting to nest in the defendants' cylindrical "heater-treaters" and then died when they could not escape. *Id.* at 682. In 2005, the Fish and Wildlife Service became aware this was occurring in the industry and embarked on an educational campaign to alert oil producers and suggest protective measures. *Id.* at 682–83. Fish and Wildlife also chose not to recommend prosecution for MBTA violations related to heater-treaters through the end of 2006, while the education campaign was ongoing. *Id.* at 683. After the grace period ended, Fish and Wildlife agents searched heater-treaters belonging to Apollo and Walker. *Id.* Defendant Apollo was later convicted for dead birds found in 2007, and Defendant Walker was convicted for dead birds found during inspections in April 2007 and April 2008. *Id.*

On appeal, the Tenth Circuit acknowledged that "the MBTA's scope, like any statute, can test the far reaches in application," but determined that it did "not have that case before [it]." *Id.* at 686. "The question," the court explained, was "whether unprotected oil field equipment can take or kill migratory birds. It is obvious the oil equipment can." *Id.* The court further concluded

8

that because due process requires that criminal defendants have adequate notice that their conduct is a violation of the law, "a strict liability interpretation of the MBTA for the conduct charged here satisfies due process only if defendants proximately caused the harm to protected birds." *Id.* Applying this proximate cause standard, the Tenth Circuit affirmed defendant Apollo's conviction, finding that Apollo had notice that its equipment had the potential to trap and kill protected birds for nearly a year and a half before the bird death resulting in its conviction. *Id.* at 691. The court also affirmed Walker's 2008 conviction, noting that the record showed that Fish and Wildlife sent Walker a letter after the birds were discovered in April 2007 admonishing Walker to secure all heater-treater cavities in which a protected bird might become trapped. *Id.* The court vacated Walker's 2007 conviction, however, because there was no evidence that Walker was aware of problems with heater-treaters in the oil industry or in his specific operations prior to April 2007. *Id.*

Reaching a different conclusion, the District of North Dakota in *Brigham Oil & Gas* and *ConocoPhillips* dismissed charges against several oil companies accused of violating the MTBA after migratory birds died in or near oil reserve pits maintained by the companies. *United States v. Brigham Oil & Gas*, 2012 WL 120055, *12 (D.N.D. Jan. 17, 2012); *United States v. ConocoPhillips Co.*, 2011 WL 4709887, *2 (D.N.D. Aug. 10, 2011). In *Brigham Oil & Gas*, the "Court expressly f[ound] that the use of reserve pits in commercial oil development is legal, commercially-useful activity that stands outside the reach of the federal Migratory Bird Treaty Act." *Id.* at *12. Likewise, the *ConocoPhillips* decision explicitly recognized that "[t]he information that has been submitted in these cases makes no allegation that reserve pits are themselves unlawful, that the reserve pits contained material that is prohibited by law, or that

there is a statute or regulation in place that requires the defendants to net the reserve pits." 2011 WL 4709887, at *2.

The Western District of Louisiana also held in *Chevron* that the MTBA did not apply to an oil producer whose commercial operations resulted in the deaths of 35 brown pelicans entrapped in one of its offshore well caissons. *United States v. Chevron*, 2009 WL 3645170, *3 (W.D. La. Oct. 30, 2009). Like the courts in *Brigham Oil & Gas* and *ConocoPhillips*, the *Chevron* court explicitly recognized that the defendant oil company's underlying conduct was otherwise lawful:

> These regulations were clearly not intended to apply to commercial ventures where, occasionally, protected species might be incidentally killed as a result of *totally legal and permissible activities,* as happened here.
>
> Several of the cases relied on by the government involve factual situations where criminal sanctions were clearly proper, that is, cases where the use of prohibited pesticides or similar toxic substances caused the death of protected species. Not only is it entirely foreseeable, in cases such as those, that the death of protected species might occur, *the death of those birds resulted from a prohibited act.* There was no prohibition cited by the government to Chevron leaving its caisson uncovered. From the stipulated facts, it appears clear that these birds died as an unintended consequence from the *legal, and widely accepted*, use of a caisson to protect the wellhead, which, no doubt, is required by federal regulation.

*Chevron*, 2009 WL 3645170, at *3 (emphasis added).

As the Government correctly points out, the evidence presented at trial established that the migratory birds at the CITGO refinery were killed as a direct result of being exposed to waste oil in uncovered tanks—tanks that under the Clean Air Act were required to be covered. *See* 42 U.S.C. §§ 7413(c)(1) & 7411(e); 40 C.F.R. § 60.692-4.[2] Texas law also requires operators to "screen, net, cover, or otherwise render harmless to birds . . . open-top storage tanks that are eight feet or greater in diameter and contain a continuous or frequent surface film or

---

2. CITGO has maintained throughout this prosecution that it was not required to install roofs on Tanks 116 and 117 because they were not "oil-water separators" as defined under the Clean Air Act, an argument this Court has rejected.

10

accumulation of oil." 16 TEX. ADMIN. CODE § 3.22(b)(1) (Vernon 1991). The Texas Code specifically admonishes:

> If an operator who maintains a tank or pit does not take protective measures necessary to prevent harm to birds, the operator may incur liability under federal and state wildlife protection laws. Federal statutes, such as the Migratory Bird Treaty Act, provide substantial penalties for the death of certain species of birds due to contact with oil in a tank or pit.

*Id.* § 3.22(a).

CITGO's failure to install roofs on Tanks 116 and 117 not only resulted in CITGO's criminal convictions under the Clean Air Act, it also directly resulted in the taking of migratory birds in violation of the MBTA. It is the unlawful nature of the underlying act—*i.e.*, failing to install roofs or otherwise net or cover Tanks 116 and 117—that distinguishes CITGO's conduct from the conduct of the defendant oil companies in *Brigham Oil & Gas*, *ConocoPhillips*, and *Chevron*, as well as otherwise lawful conduct cited by CITGO, such as driving a car or owning a cat or a building with windows.

After a thorough review of the relevant case law, the Court agrees with the Tenth Circuit's holding in *Apollo Energies* that it is obvious that "unprotected oil field equipment can take or kill migratory birds." 611 F.3d at 686. The Court further adopts the Tenth Circuit's opinion that "a strict liability interpretation of the MBTA for the conduct charged here satisfies due process only if defendants proximately caused the harm to protected birds." *Id.* Thus, the Court must determine whether it was reasonably foreseeable that CITGO's operation of open-air tanks would result in bird deaths.

The evidence presented at trial established that a number of individuals saw oil-covered birds—both dead and alive—inside Tanks 116 and 117 as early as 1997. (7/9/07 Trial Tr. at 55:12–56:22, 95:13–96:8, 158:15-19, 193:16–196:10, 204:25–205:3, 233:14–234:25, 244:10–

11

246:14, 249:5–249:6.) One CITGO employee testified that he told his supervisor about dead ducks in Tanks 116 and 117 and suggested that CITGO put roofs on the tanks. (*Id.* at 55:12–56:22, 74:2-5.) A number of individuals who worked for a company that CITGO used to clean the tanks also testified that their vacuum filters often got clogged with bird bones and debris when they cleaned Tanks 116 and 117. (*Id.* at 89:22–90:6; 125:1–126:23; 153:6-12; 225:3–226:10.)

An Environmental Manager at CITGO testified that, sometime in the mid-90s, he learned that oil was accumulating in Tanks 116 and 117 and became concerned that it represented a threat to wildlife. (7/10/07 Trial Tr. at 19:19–21:17.) After he saw a dead duck floating on top of the oil in one of the tanks sometime in 1998, he brought the duck to the attention of the two asset managers for the terminal as well as a number of managers, including senior management staff at CITGO. (*Id.* at 24:15–25:24.) He specifically told senior management that any migratory bird that was taken or killed because of landing in the tank would be a violation of the MBTA. (*Id.* at 29:17-23, 31:19–32:25.) Sometime in the mid-90s, he also suggested to another member of CITGO's senior management team that CITGO install nets on the tanks to prevent birds from landing in the oil. (*Id.* at 49:14-24.)

A Process Engineering Group Leader at CITGO testified that he learned that CITGO had an issue with birds getting into Tanks 116 and 117 from operators who came to him and said they didn't think they should have birds in the tanks. (*Id.* at 83:7-13, 85:3-9.) He also saw three dead pelicans at one time. (*Id.* at 83:13-14.) He further testified that he remembered having discussions with CITGO's Environmental Manager about putting roofs on the tanks in order to comply with the Clean Air Act and thought that would also help keep birds out of the tanks. (*Id.* at 88:16-23.)

Finally, the Government presented evidence that Tanks 116 and 117 are located along the Corpus Christi ship channel and adjacent to waters that form part of a major flyway for migratory birds. (*Id.* at 187:10-23.)

Based on the evidence presented at trial, not only was it reasonably foreseeable that protected migratory birds might become trapped in the layers of oil on top of Tanks 116 and 117, CITGO was aware that this was happening for years and did nothing to stop it. CITGO's unlawful, open-air oil tanks proximately caused the deaths of migratory birds in violation of the MBTA.

## IV. Conclusion

For the aforementioned reasons, CITGO's Motion to Vacate CITGO's Conviction for Violations of the Migratory Bird Treaty Act (Dkt. No. 766) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 5th day of September, 2012.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE