UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, § | | |
|    Plaintiff, § | | |
| § | | |
| v. § | | CRIMINAL ACTION NO. C-06-563 |
| § | | |
| CITGO PETROLEUM CORPORATION, § | | |
| CITGO REFINING AND CHEMICALS § | | |
| COMPANY, L.P., § | | |
|    Defendants. § | | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court are the Community Members'[1] motions requesting restitution and a remedial order (Dkt. Nos. 831, 841), to which Defendants CITGO Petroleum Corporation and CITGO Refining and Chemicals Company, L.P. (collectively "CITGO") have responded (Dkt. Nos. 855, 861, 886) and the Community Members have replied (Dkt. Nos. 857, 897). The Government has also filed a memorandum requesting restitution on behalf of all crime victims in this case (Dkt. No 910), to which CITGO responded (Dkt. No. 913).

**I. Background**

On June 27, 2007, the CITGO Defendants were convicted by a jury on two felony counts each of operating an oil water separator without the proper emission control devices, in violation of the Clean Air Act, 42 U.S.C. §§ 7413(c)(1), 7411(e) and 40 C.F.R. § 60.692-4. Following a separate bench trial, CITGO Refining and Chemicals Company, L.P. was convicted on July 17, 2007 on three misdemeanor counts of unlawfully taking and aiding and abetting the taking of migratory birds in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703(a).

---

1. The Community Members include James Galloway, Joel Mumphord, Rosalinda Armadillo, Jewell Allen, Mavis Branch, Feliciano Cantu, Robe Garza, Diana Linan, Thelma Morgan, James Shack, Jean Salone, Julian Garcia, John Garcia, and Betty Whiteside. The Additional Community Members are Frank Perez, Bertha Wilson, Julian Garcia III, Janie Mumphord, Victoria, Garza, and Desiree Lara for herself and her minor child S.B.

During community meetings the Department of Justice held in 2007 to identify potential victims of CITGO's Clean Air Act violations, the Government obtained more than 300 Victim Impact Statements, which were submitted to the United States Probation Office. In April 2008, the Government moved to have these individuals designated as victims under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. (Dkt. No. 574.) Shortly thereafter, the Court began hearing testimony from a representative sample of the alleged victims—including six of the Community Members[2]—as well as CITGO employees, Texas Commission on Environmental Quality (TCEQ) agents, and a series of experts offered by the Government and CITGO.

On April 5, 2011, the Court granted CITGO's Motion to Exclude the Government's Purported "Victim" Witnesses (Dkt. No. 575), concluding that these individuals could not be considered victims under the CVRA because they could not demonstrate a causal connection between their alleged injuries—acute health effects including burning eyes, bad taste in the mouth, nose burning, sore throat, skin rashes, shortness of breath, vomiting, dizziness, nausea, fatigue, and/or headaches—and the offenses of which CITGO was convicted. (Dkt. No. 729.) In reviewing the scientific evidence before it, the Court recognized that "none of the medical records documenting more than 950 office visits diagnose[d] chemical exposure and none of the other medical records even mention chemical odors." (*Id.* at 7.) The Court further found that because the monitoring data from the Corpus Christi area did not show readings of volatile organic compounds that exceeded state and federal regulatory levels, there was no proof that the concentration of chemicals in the emissions from Tanks 116 and 117 rose to the level necessary to cause health effects. (*Id.* at 6–7.) Because many of the alleged victims were either elderly persons who struggled with a number of common ailments, had serious medical conditions, and/or admitted to smoking cigarettes, and because all the alleged victims also lived near a group

---

2. Mumphord, Armadillo, Linan, Morgan, Salone, and Whiteside testified.

2

of oil refineries in Corpus Christi known as "Refinery Row", the Court concluded that the evidence offered could not establish that the alleged victims' ailments were caused by Tanks 116 and 117 and not by one or more of these other factors. (*Id.* at 5–7.) The Government filed a motion to reconsider the Court's Order (Dkt. 733), which the Court denied on July 27, 2011. (Dkt. No. 737.)

On July 6, 2012, 15 representative members of the Corpus Christi community, referred to as the "Community Members," filed their own Motion to be Declared Victims under the CVRA (Dkt. No. 776). On August 22, 2012, the Court denied the Community Members' motion as untimely. (Dkt. No. 799.) The Community Members then petitioned the United States Court of Appeals for the Fifth Circuit for a writ of mandamus directing this Court to give them crime victim status under the CVRA. The Fifth Circuit concluded that "[t]he CVRA does not contain a time limit within which putative crime victims must seek relief in the district court" and granted the Community Members' mandamus petition "to the extent that the district court must hear all new victim status arguments being submitted pre-sentencing by pro bono counsel." *In re: Jewell Allen*, No. 12-40954 at 3 (5th Cir. Sept. 6, 2012).

On remand, the Court issued a Memorandum Opinion & Order reversing its previous decision, recognizing the Community Members as crime victims under the CVRA, and providing that the Community Members could submit a written sentencing memorandum focusing on restitution related to medical monitoring and a buy-out of some residential properties. (Dkt. No. 819.) During a subsequent hearing, the Court further required any Community Member seeking restitution to submit a sworn declaration and supporting documentation. The Community Members timely complied. (Dkt. Nos. 840, 841.)

The Court ultimately declared that, in addition to the Community Members, all persons who lived near the CITGO East Refinery between January 1994 and May 2003 who could establish that they experienced burning eyes, bad taste in the mouth, nose burning, sore throat, skin rashes, shortness of breath, vomiting, dizziness, nausea, fatigue, and/or headaches as a result of exposure to Tanks 116 and 117 would be granted victim status under the CVRA. (Dkt. No. 838.) All persons wishing to participate in this action as a crime victim were required to submit to the Court a written victim impact statement no later than November 5, 2012, and any person failing to do so would not be considered a crime victim. (Dkt. No. 829.) More than 800 individuals submitted victim impact statements in 2007 and/or 2012, many seeking restitution in varying amounts for various losses.

The Court held presentencing hearings on October 15, 16, and 17, 2013, during which more than 90 individuals, including a number of Community Members, orally addressed the Court. At the conclusion of those hearings, the Court invited the Community Members and the Government to file additional briefing in support of their requests for restitution and specifically requested that they identify the type of evidence that would be relied upon to establish a causal connection between the victims' losses and Tanks 116 and 117.

In response, the Community Members and the Government filed supplemental briefing on the issue of restitution, to which CITGO responded. (*See* Dkt. Nos. 898, 899, 903, 906, 910, 911, 912, 913, 914, 916.) In this briefing, the Community Members ask the Court to order CITGO to pay over $30,000,000.00 in restitution and/or remedial orders for themselves and other crime victims, including payments for medical monitoring, future medical expenses, relocation costs, and attorneys' fees. The Government also seeks restitution and/or a remedial order that would require CITGO to pay $25,000,000.00 into a fund to cover the costs of

relocation, out-of-pocket medical expenses, personal and real property damage or diminution, medical monitoring, a court-ordered monitor, and fund administration.

On February 5, 2014, the Court sentenced CITGO to a fine of $2,045,000.00—the maximum fine allowed by law—and further stated that because of the complex issues involved with restitution, the Court would issue a written decision on the issue of restitution within 90 days. That decision is set forth herein.

## II. Legal Standard

Once an individual is declared a "crime victim" under the CVRA, he or she is entitled to a number of enumerated rights, including "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). The Mandatory Victims Restitution Act (MVRA), provides that when a defendant has been convicted of any of a list of specified offenses, the sentencing court "shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A. The MVRA's discretionary counterpart, the Victim and Witness Protection Act (VWPA), provides that, in cases where the MVRA does not apply, the court "may order" a defendant convicted of an offense to "make restitution to any victim of such offense." 18 U.S.C. § 3663. Because CITGO's crimes do not fall within those specific crimes enumerated in the MVRA, the discretionary VWPA applies here.

Under the VWPA, restitution can only be ordered for "the amount of the loss sustained by each victim as a result of the offense." *Id.* § 3663(a)(1)(B)(i)(I). Thus, the amount of restitution ordered "cannot be greater than the loss caused by the conduct underlying the offense of conviction." *United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007). "When a defendant is ordered to pay restitution in an amount greater than the loss caused, the error affects substantial rights as well as the fairness and integrity of the judicial proceeding." *Id.*

5

When a request for restitution under the VWPA is contested, the Government must prove the amount of loss proximately caused by the offense by a preponderance of the evidence. 18 U.S.C. § 3664(e); *see also United States v. Tsosie*, 639 F.3d 1213, 1222 (9th Cir. 2011) ("[Section] 3664(e)'s reference to a 'preponderance of the evidence' requires that, when there is a dispute as to restitution, a restitution order must be supported by evidence in the record showing that it is more likely than not that the defendant's offense proximately caused the losses for which restitution was awarded and that it did so in the amounts awarded."); *United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998) ("A restitution order entered without proof of loss is clearly erroneous.").

Finally, the VWPA explicitly provides that a court may decline to order restitution "[t]o the extent that the court determines the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution . . . outweighs the need to provide restitution to any victims." 18 U.S.C. § 3663(a)(1)(B)(ii). The Sentencing Guidelines similarly provide that a court is not required to enter a restitution order if it finds, "from facts on the record, that (A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." U.S.S.G. § 8B1.1(b)(2). As recognized in *B.P. Products*, "[t]he cases show that if there are multiple victims present, the causation issues are disputed, and the losses include significant amounts of disputed future losses, the complexity exception to calculating losses in setting a fine (or restitution) is likely to apply." *United States v. BP Products North America Inc.*, 610 F. Supp. 2d 655, 706 (S.D. Tex. 2009) (citing *In re W.R. Huff Asset Mgt. Co., LLC*, 409 F.3d 555, 563–64

(2d Cir. 2005) (multiple victims); *United States v. Reifler*, 446 F.3d 65, 113–39 (2d Cir. 2006) (multiple victims and disputed causation); *United States v. Foote*, 2003 WL 22466158, *7 (D. Kan. Jul. 31, 2003) (multiple victims and disputed causation); *United States v. Kones*, 77 F.3d 66, 69 (3d Cir. 1996) (disputed causation); *United States v. Gibson*, 409 F.3d 325, 342 (6th Cir. 2005), (disputed causation); *United States v. Schwartz*, 2006 WL 1662899, *5 (D. Conn. May 25, 2006) (disputed causation); *United States v. Oslund*, 453 F.3d 1048, 1062–63 (8th Cir. 2006), (disputed future losses); *United States v. Cienfuegos*, 462 F.3d 1160, 1167–68 (9th Cir. 2006) (disputed future losses)).

### III. Analysis

As stated *supra*, the Community Members ask the Court to order CITGO to:

(1) Pay restitution for medical monitoring of the Community Members and other victims;

(2) Establish a fund to cover future medical expenses of the Community Members and other victims;

(3) Establish a fund to cover future relocation costs of the Community Members and other victims; and

(4) Pay the Community Members' attorneys' fees.

Hundreds of other individuals asserting crime victim status have also submitted written and/or oral victim impact statements seeking restitution for relocation expenses, past and future medical bills, and a myriad of other losses. The Government asks the Court to Order CITGO to establish a trust fund to cover the expenses set forth above and pay to administer the fund.

#### 1. Medical Monitoring

The Community Members first ask for $80,900.00 in restitution for "necessary medical screening", explaining that they were exposed to what the Government has called a "chemical cocktail" from Tanks 116 and 117 and therefore need to monitor their health. According to the

7

Community Members, annual medical screening is necessary to allay their fears that they may suffer from cancer or other diseases because CITGO placed them criminally at risk, and the fact that the identity of the chemicals to which they were exposed is unknown further exacerbates this need.

Restitution is permissible for "necessary medical and related professional services" where a criminal offense results in "bodily injury to a victim". 18 U.S.C. § 3663(b)(2)(A). Assuming the short-term health effects suffered by the Community Members and other similarly-situated victims constitute "bodily injury" under the statute, before ordering restitution for medical monitoring, the Court must determine whether medical monitoring is necessary for each person making such a request, as well as the cost of such screening.

In declaring that the Community Members are "victims" under the CVRA, the Court previously found that Tanks 116 and 117 harmed the Community Members by causing their *short-term health effects* on at least two specific days. However, the Court also previously recognized that there has been no evidence presented that Tanks 116 and 117 released emissions capable of causing *long-term health effects*. (*See* Dkt. No. 728 at 11 (noting that there was "[n]o evidence showing harmful concentrations during these occurrences [when odors were traced back to the tanks] has been brought to the Court's attention").) At the end of the presentencing hearings in October 2013, the Court asked the Government and the Community Members to at least identify the type of evidence that would be relied upon to establish a causal connection between the tanks and the victims' requests for restitution, including those related to medical issues. (10/31/2013 Tr. at 112:24–113:8.) However, neither the Community Members nor the Government have identified any additional evidence supporting their claim that the victims in

8

this case were exposed to emissions from Tanks 116 and 117 at levels sufficient to cause an increased risk of future latent disease, thereby necessitating medical monitoring.

The Community Members nonetheless argue that because CITGO has failed to prove a negative by demonstrating that they are not at an increased risk of future latent disease, then it is "100% certain" that the Community Members "have suffered *some* risk of developing diseases." (Dkt. No. 916 at 8.) Assuming, *arguendo*, that the Community Members and other victims are at an increased risk of future latent disease because of Tanks 116 and 117, the Court would still be required to calculate the cost of medical monitoring for each victim.

The Community Members argue that the Court could easily calculate how much medical monitoring would cost by taking a rough measure of each victim's life expectancy multiplied by the expected cost of annual medical checkups, which the Community Members guess to be $250.00 per year. However, neither the Community Members nor the Government have provided the Court with any information regarding the type of medical testing sought or the cost of each test, nor do they provide any evidence in support of this $250.00 figure. Instead, each Community Member's affidavit states, at most, what the total cost would be *if* they could get an annual medical checkup and/or screening for $250.00. (*E.g.*, Allen Aff., Dkt. No. 831, Ex. 1 at 2; Armadillo Aff., *Id.* Ex. 2 at 2; Whiteside Aff., *Id.* Ex. 4 at 1.)

Moreover, the average life expectancy in the United States is 78.7 years. *See* Organization for Economic Cooperation and Development, HEALTH AT A GLANCE 2013: OECD INDICATORS at 25 (OECD Publishing 2013), available at http://www.oecd.org/els/health-systems/Health-at-a-Glance-2013.pdf (last visited Apr. 29, 2014); *Life Expectancy at Birth, Total (Years)*, THEWORLDBANK.COM, http://data.worldbank.org/indicator/SP.DYN.LE00.IN (last visited Apr. 29, 2014). However, the majority of the Community Members have asked for a

9

lump sum to cover annual medical exams well into their 80s, and two seek medical screenings beyond age 90. (*See* Dkt. No. 831 at 11.) Although an individual's life expectancy may differ from the average based on a wide number of factors like current health, lifestyle, and family history, the Community Members do not explain how they calculated their own life expectancies, nor do they offer any explanation regarding how the Court should determine the life expectancies of hundreds of other alleged victims on behalf of whom they seek medical monitoring.

In sum, the Court finds that the Community Members and the Government have failed to show, based on a preponderance of the evidence, that medical monitoring is necessary based on their increased risk of future latent disease due to Tanks 116 and 117. Even assuming such testing were necessary, the Court is without sufficient information to come up with a reasonable figure to address medical monitoring, and it is not inclined to arbitrarily designate a figure without such information. The Parties have had ample time to present such evidence to the Court, and to allow them even more time to do so would unduly delay the sentencing process.

The Court further finds that the "complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution" for medical monitoring "outweighs the need to provide restitution to any victims." *See* 18 U.S.C. § 3663(a)(1)(B)(ii). The Community Members' request for $80,900.00 in restitution for "necessary medical screening" is therefore **DENIED**.

### 2. Future Medical Expenses

The Community Members next ask the Court to enter a remedial order directing CITGO to create a trust fund in the amount of $11,000.000.00 to cover future medical expenses that they and other victims may incur as a result of CITGO's failure to cover Tanks 116 and 117. The

Community Members ask the Court to appoint a Special Master to oversee the trust fund, and if the fund is not exhausted after 30 years, all monies will be returned to CITGO along with any interest earned.

The Sentencing Guideline relied upon by the Community Members provides that "[i]f the magnitude of expected future harm can be reasonably estimated, the court may require the organization to create a trust fund sufficient to address that expected harm." U.S.S.G. § 8B1.2(b). Here, the Community Members estimate the cost of future harm to be $11,000,000.00. Citing the National Cancer Institute Cancer Prevalence and Cost of Care Projections, they explain that the average cost of care for an individual who contracts lethal cancer or another similar deadly disease at age 65 and lives for 10 years is roughly $250,000.00. *See* *http://costprojections.cancer.gov/annual.costs.html.* They therefore ask for $10,000,000.00 ($250,000.00 x 300 victims x 1 in 7.5 chance of contracting cancer) plus $1,000,000.00 (10%) in administrative costs.

The gaping hole in the Community Members' argument is that they provide absolutely no evidence supporting their speculation that 1 in every 7.5 victims in this case will develop leukemia or any other deadly disease in the future as a result of exposure to Tanks 116 and 117. As the Ninth Circuit has explained, "[w]here there is nothing but a possibility that a victim will incur future [medical] costs, 'the statutory restitution scheme simply does not allow for restitution orders based on such speculation rather than proof. The government cannot bear the burden of proving the amount of a loss by a preponderance of the evidence when it is no more than possible that the loss will occur at all.'" *United States v. Matt*, 38 Fed. App'x 446, 447 (9th Cir. 2002) (quoting *United States v. Follet*, 269 F.3d 996, 1002 (9th Cir. 2001)) (alterations in *Matt* omitted).

Even if such a figure could be reasonably estimated, before any victim seeking restitution for medical expenses could receive a payout from the fund, the Court—not a Special Master—would be required to make a finding that the victim's medical expenses were a direct and proximate result of exposure to Tanks 116 and 117. *See United States v. Stover*, 93 F.3d 1379, 1389 (8th Cir. 1996) (holding "the district court lacked authority to leave the designation of the payee or payees entirely to the discretion of the probation office" because, "[a]s a general rule, the district courts should designate the recipient or recipients when ordering restitution pursuant to 18 U.S.C. § 3663"); *United States v. Gio*, 7 F.3d 1279, 1292 (7th Cir. 1993) (vacating restitution order in which "the district court gave the probation office too much discretion for the management of the restitution order," including the determination of amounts of payment). Before the Court could make such a determination, the Government would have to prove, by a preponderance of the evidence, that: (1) the claimant was exposed to emissions from Tanks 116 and 117 between January 1994 and May 2003; (2) he or she suffered an actual loss as a direct and proximate result of exposure to Tanks 116 and 117; and (3) potential alternative causes, such as emissions from other refineries or potential emissions from CITGO not related to Tanks 116 and 117, can be excluded. The Government must also prove (4) an accurate computation of any loss.

The Court previously recognized that "*not one single medical record* documenting more than 950 office visits ever diagnosed chemical exposure in this case." (Dkt. No. 737 at 8 (emphasis in original).) Assuming a victim could prove that they had developed a medically diagnosable condition that was caused by chemical exposure, they would still be required to trace their exposure specifically back to Tanks 116 and 117 in order to be entitled to restitution for related medical expenses. As stated *supra*, these individuals all live or lived near "Refinery

Row." Dr. Montgomery testified in 2008 that there are multiple potential sources of benzene emissions in that area, including several crude oil tanks, a gasoline truck-loading rack, benzene storage tanks, various aromatics processing units, cumene and hydrar plants, numerous gasoline storage tanks, the Flint Hills wastewater treatment plant, two Citgo barge docks, and two Flint Hills docks. (5/12/2008 Tr. at 17:3–19:8.) As also stated *supra*, at the end of the October 2013 presentencing hearings, the Court asked the Government and the Community Members to identify "the type of evidence that would be relied upon to establish a connection, a causal connection between the various medical problems and the two tanks." (10/31/2013 Tr. 112:24–113:8.) However, the supplemental memoranda they submitted in response to the Court's request contain no reference to additional evidence in support of their claims for future medical expenses.

The Community Members and other individuals submitting victim impact statements have identified the following illnesses and other medical conditions from which they claim they have suffered (or currently suffer) as a result of CITGO's crimes: several types of cancer, including cancer of the brain, nose, colon, throat, prostate, breast, ovaries, and thyroid, as well as chronic lymphoma; various "heart problems," including heart attacks, heart disease, and irregular heartbeat; chronic sinus infections and sinusitis; respiratory issues, including COPD, lung infections, asthma, bronchitis, upper respiratory infections, emphysema, pneumonia, and collapsed lung; general "stomach problems," as well as gastroenteritis, severe diarrhea, and a flesh-eating bacterial infection leading to a hole in the abdomen; various mental health issues, including nervous breakdown, general "mental disorders", anxiety, depression, stress, memory problems, and blackouts; lung, liver, kidney, thyroid, and eye "problems"; and nearly two dozen other health issues, including sclerma, epilepsy, chronic migraines, high blood pressure,

fibromyalgia, diabetes, earaches, cysts in the breast and brain, kidney stones, hair loss, neuropathy, shingles, muscle spasms, brain tumor, cataracts, liver disease, anemia, tremors, chronic laryngitis, vocal cord "pallets", and the inability to have children. Determining whether these or any other illnesses the 800+ victims may develop 5, 10, 20, or even 30 years from now were proximately caused by exposure to Tanks 116 and 117 would require that the Court examine medical records; hear testimony by experts regarding chemical exposure, causation, and loss calculations; and allow CITGO to cross-examine each individual seeking a payout to determine whether emissions from Tanks 116 and 117 between January 1994 and May 2003 caused the loss—effectively turning each request for a payout into a mini personal injury case. This "could easily extend the sentencing phase longer than any trial and would require complex—and to some inevitable extent, speculative—calculation." *BP Products*, 610 F. Supp. at 700–01.

As such, the Court finds that the "magnitude of expected future harm can[not] be reasonably estimated" and that the "complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution" for future medical expenses "outweighs the need to provide restitution to any victims." *See* 18 U.S.C. § 3663(a)(1)(B)(ii); U.S.S.G. § 8B1.2(b). The Community Members' request for a remedial order directing CITGO to create a trust fund in the amount of $11,000,000.00 to cover future medical expenses is therefore **DENIED**.

### 3. Relocation Costs

The Community Members next ask the Court to enter a remedial order directing CITGO to create a trust fund in the amount of $18,403,200.00 ($15,336,000.00 + 20% administrative

costs) to cover a property buy-out and relocation expenses for the Community Members and other victims.

The Community Members originally asked the Court for a property buy-out and relocation expenses as restitution for damage to their homes and property values. As the Court previously explained during the October 2013 presentencing hearings, because restitution can only compensate a victim for his or her actual losses, the proper measure of restitution for lost property value is the diminution in value of the property caused by the offense, not the costs associated with purchasing and moving to a new house. *See* 10 A.L.R. 2d 669 ("As a general rule, the measure of damages from a permanent nuisance is the depreciation in the market value of the property injured, and the measure of damages from a temporary nuisance is the diminution in the rental or usable value of the property.").

The Community Members now state that they are not seeking restitution for lost property values, but instead ask the Court for a "remedial order allowing them to relocate away from the danger that CITGO created – and continues to create." (Dkt. No. 916 at 19.) According to the Community Members, because of CITGO's discharges from Tanks 116 and 117, many people left the neighborhood, blocks of houses are now boarded up, and the elementary school closed. The residents of Hillcrest live in a "virtual dead zone" and still suffer from anxiety and fear that CITGO will expose them to more chemicals. The Community Members therefore request a remedial order under U.S.S.G. § 8B1.2 in order to "prevent future harm" from the "ongoing illegal emissions [that] continue to threaten harm to the community victims." (*Id.* at 20–21.)

The Sentencing Guideline relied upon by the Community Members provides as follows:

> To the extent not addressed under § 8B1.1 (Restitution—Organizations), a remedial order imposed as a condition of probation may require the organization to remedy the harm caused by the offense and to eliminate or reduce the risk that the instant offense will cause future harm.

U.S.S.G. § 8B1.2(a).

The fatal flaw in the Community Members' argument is that any remedial order entered by the Court must "eliminate or reduce the risk that *the instant offense* will cause future harm." *Id.* (emphasis added). Even assuming the Community Members are correct that CITGO continues to illegally release other emissions, the Court can only focus on the offense conduct, *i.e.*, CITGO's failure to install roofs on Tanks 116 and 117. Because Tanks 116 and 117 were covered over a decade ago, there is no identifiable risk that these tanks will cause future harm.

To the extent the Community Members seek restitution for damage to their property and to the Hillcrest neighborhood that Tanks 116 and 117 may have previously caused, the Court finds that neither the Community Members nor the Government have carried their burden of demonstrating causation or of quantifying an ascertainable amount of loss to their property values, and likewise provide no reference to any evidence establishing that Tanks 116 and 117 played a role in any devaluation that may have occurred.

The Community Members' request for a remedial order directing CITGO to create a trust fund in the amount of $18,403.200.00 to cover a property buy-out, relocation expenses, and fund administration is therefore **DENIED**.

### 4. Attorneys' Fees

The Community Members also ask the Court to award their attorneys' fees and expenses as restitution.

The Community Members cite *United States v. Dwyer*, 275 Fed. App'x 269 (5th Cir. 2008), and *United States v. Beird*, 145 Fed. App'x 853 (5th Cir. 2005), for the proposition that attorneys' fees are recoverable as criminal restitution in this case. However, those cases were decided under the MVRA, which applies only to specific enumerated crimes and provides that

16

the defendant shall "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).[3] As explained in Part II *supra*, the VWPA, not the MVRA, applies in this case.

The VWPA contains similar language regarding discretionary restitution for "other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663(b)(4). However, the Fifth Circuit has declined to order restitution for attorneys' fees and similar costs under this statute, recognizing that "the VWPA provides no authority for restitution of consequential damages involved in determining the amount of the loss or in recovering those funds." *United States v. Schinnell*, 80 F.3d 1064, 1071 (5th Cir. 1996) (citing *United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir. 1989) (no restitution for "cost of employing counsel to recover from an insurance company"); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir. 1990) (no restitution for attorneys' fees spent investigating fraudulent claim); *Government of the Virgin Islands v. Davis*, 43 F.3d 41, 44–46 (3d Cir. 1994) (no restitution for attorneys' fees generated to recover or protect property), *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir. 1992) (no restitution for attorneys' fees and expenses in liquidating company); *United States v. Mullins*, 971 F.2d 1138, 1146–48 (4th Cir. 1992) (no restitution for attorneys' fees and investigators to recover property)). *See also United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993) (no restitution for attorney fees to recover victims' property where fees were "not directly related to the defendant's criminal conduct").

---

3. 18 U.S.C. § 2259(b)(3)(E), which is also not at issue here, explicitly provides for restitution for attorneys' fees and costs in cases involving the sexual exploitation of a child.

17

Even if the Court were to apply the MVRA—as urged by the Community Members—they still would not be entitled to recover their attorneys' fees because the fees were not necessarily incurred during these proceedings. *See United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir. 2008) ("The [MVRA] requires that the included expenses be 'necessary,' and that they be 'incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.'"). Because the Texas Legal Services Center and Utah Appellate Clinic offered their services *pro bono*, the Community Members did not *incur* any attorneys' fees. *See United States v. Follet*, 269 F.3d 996, 1000 (9th Cir. 2001) ("A cost for which the victim will never have to pay because the services will be provided directly by a governmental or charitable organization is not 'incurred' by the victim, even if that organization will incur costs for the benefit of the victim."). Furthermore, the Government previously assumed responsibility for securing the Community Members' rights under the CVRA and has zealously pursued those rights throughout the course of this litigation; thus, it was not *necessary* for the Community Members to retain private counsel to represent them. *See In re Zackey*, 2010 WL 3766474, *1 (3d Cir. Sept. 22, 2010) (affirming district court's order denying private attorney's request to appear on behalf of crime victim, where district court "held that the CVRA 'does not require that a victim be represented by counsel when being heard, or that victim's counsel be allowed to speak during the sentencing or any other proceeding in the case,' and it concluded that the assistance of the U.S. Attorney would be 'sufficient for determining a proper sentence'."). Given the Government's statutory responsibility to represent victims under the CVRA and VWPA, that the Community Members would hire private counsel in an attempt to recover restitution from CITGO during these proceedings was neither a direct nor foreseeable consequence of CITGO's offense of conviction, *i.e.*, its failure to install roofs on Tanks 116 and

117. *See United States v. Maturin*, 488 F.3d 657, 660–61 (5th Cir. 2007) ("[T]he restitution award can encompass only those losses that resulted directly from the offense for which the defendant was convicted. "); *United States v. Corey*, 77 Fed. App'x 7, 11 (1st Cir. 2003) (recognizing that "[f]requently attorney's fees will not be recoverable" as criminal restitution under the MVRA and adding that the determination as to recoverability "entails a fact-intensive inquiry that is best conceptualized in terms of foreseeability").

The Community Members' request for restitution for attorneys' fees and expenses is therefore **DENIED**.

### 5. Miscellaneous Requests

More than 800 victim impact statements have been submitted to the Court, whereby potential victims in addition to the Community Members describe unique facts, circumstances, and requests for restitution. In addition to those requests focusing on medical-related issues and property devaluation, these statements include requests for a wide array of losses, including, but not limited to, lost wages, missed educational opportunities, pain and suffering, travel expenses, automobile repairs, deceased pets, house repairs (roof, repainting, A/C filters), blankets, detergent, clothing, outdoor sporting goods (trampoline, swimming pool, swing set), landscaping (plants, sod, fertilizer, trees, rose bushes, vegetable garden), sleep studies, a treadmill, items that were repossessed because the victim couldn't work and pay for them, and general "financial loss."

Much like restitution for medical expenses, the Court would be required to determine issues of fact related to exposure, proximate cause, potential alternative causes, and accurate computation of loss for each item described above, effectively turning each request for restitution into a separate tort case. Moreover, despite the Court's request to at least identify the type of

evidence upon which they would rely to show causation and proof of loss, neither the Government nor the victims making these restitution requests have identified what evidence they would offer to support these requests.

The Court finds that the "complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution" for the miscellaneous restitution requests set forth above "outweighs the need to provide restitution to any victims," and that the "magnitude of expected future harm can[not] be reasonably estimated." *See* 18 U.S.C. § 3663(a)(1)(B)(ii); U.S.S.G. § 8B1.2(b). Accordingly, the Government's request for a trust fund to cover restitution requests made by victims other than the Community Members is **DENIED**.

## IV. Conclusion

For the reasons set forth above, the Community Members' motions requesting $30,000,000.00 in restitution and/or a remedial order for medical monitoring, future medical expenses, relocation expenses, and attorneys' fees (Dkt. Nos. 831, 841) and the Government's request for $25,000,000.00 in restitution and/or a remedial order for relocation costs, out-of-pocket medical expenses, personal and real property damage or diminution, medical monitoring, a court-ordered monitor, and fund administration (Dkt. No. 910) are **DENIED**.

It is so **ORDERED**.

**SIGNED** this 30th day of April, 2014.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE